## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

K.H. JANE DOE,

        Plaintiff,

     v.                                Case No. 09-C-1176

NICOLE SAFTIG,
CITY OF NEW BERLIN, and
ZURICH AMERICAN INSURANCE COMPANY,

        Defendants.

---

### DECISION AND ORDER

---

### I.  PROCEDURAL BACKGROUND

On November 30, 2009, the plaintiff filed this action against the defendants in the Circuit Court for Waukesha County, Wisconsin.  The defendants removed the case to federal court on December 22, 2009, based on the plaintiff's federal claims under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, and the Fourteenth Amendment.  The action was assigned to this court and the parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General L.R. 73 (E.D. Wis.).

The plaintiff asserts seven causes of action.  With regard to federal claims, the plaintiff alleges that defendant Nicole Saftig ("Saftig") violated the FCRA by disclosing the plaintiff's credit information and also violated the "due process and equal protection provisions of the Fourteenth Amendment . . . as enforced through 42 U.S.C. § 1983."  (Am. Compl. ¶¶ 20, 22.) Additionally, the plaintiff asserts the following state law claims: (1) violation of the plaintiff's right to privacy pursuant to Wis. Stat.

§ 995.50(2)(a) and (c); (2) intentional and negligent infliction of emotional distress; and (3) violation of the "due process and equal protection provisions of Article I §§ 1, 9 and 22 of the Wisconsin Declaration of Rights."[1]  (Am. Compl. ¶¶ 19, 21, 23.)

In addition to her substantive claims, the plaintiff alleges that defendant City of New Berlin ("New Berlin") is responsible for the actions Saftig committed within the scope of her employment, pursuant to Wis. Stat. § 895.46.  (Am. Compl. ¶ 24.)  The plaintiff also asserts that Zurich American Insurance Company ("Zurich") is responsible for insuring the liabilities of both Saftig and New Berlin, pursuant to Wis. Stat. § 803.04(2)(a).  (Am. Compl. ¶¶ 25, 26.)

On December 6, 2010, the defendants filed a motion for summary judgment seeking to dismiss all of the plaintiff's claims.  The defendants' motion is now fully briefed and is ready for resolution by the court.  For the reasons that follow, the defendants' motion will be granted in part and denied in part.

## II.  FACTUAL BACKGROUND

In accordance with the provisions of Civil L.R. 56(b)(1)(C) (E.D. Wis.), the defendants' motion for summary judgment was accompanied by a set of proposed findings of fact.  The plaintiff filed responses to the proposed findings of fact set forth by the defendants.  The plaintiff also filed additional proposed findings of fact, and the defendants filed its responses thereto.  Before discussing the factual background of the case, the court will address the defendants' objection to the plaintiff's reliance on the New Berlin Police and Fire Commission Findings of Fact.

The plaintiff cites to the New Berlin Police and Fire Commission Findings of Fact in several of her responses to the defendants' proposed findings of fact and in the plaintiff's own proposed findings of fact.  The defendants object to the plaintiff's use of the Commission's Findings of Fact, arguing that

---

[1]  The Wisconsin Declaration of Rights is article I of the Wisconsin Constitution.

2

they are inadmissible.

Although the Commission's Findings of Fact are potentially hearsay, they may be admissible pursuant to Fed. R. Evid. 803(8)(C), which provides for admission of "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." *See Allen v. Chicago Transit Auth.*, 317 F.3d 696, 700 (7th Cir. 2003) (finding an investigative report of a public agency admissible and further stating that the weight given to such evidence "is for the jury to decide, not the judge in ruling on a motion for summary judgment.").

For purposes of the defendants' motion for summary judgment, the court finds no reason to believe that the Commission's Findings of Fact "lack trustworthiness". The defendants allege that the factual findings are based on a "flawed process" and should therefore be disregarded. However, the defendants themselves cite to several portions of the Commission's factual findings to support the defendants' proposed findings of fact. For the present purposes, I find the Commission's Findings of Fact admissible. However, this decision has no bearing on the court's decision to admit or exclude the findings should the case proceed to trial. *See Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 827 n.9 (7th Cir. 1999) ("Administrative findings are sometimes admissible as evidence. Nevertheless, the district court retains significant discretion as to whether such material ought to be admitted.") (citations omitted).

A review of the parties' respective proposed findings and the responses thereto reveal that, for purposes of the court's treatment of the defendants' motion, the following are the facts that are relevant to the disposition of the motion for partial summary judgment.

Before applying for the dispatcher position with the City of New Berlin Police Department ("Police Department"), the plaintiff was a nail technician and owned her own salon for approximately

ten years at various locations in Hales Corners, Wisconsin and New Berlin, Wisconsin. (Defendants' Proposed Findings of Fact ("DPFOF") ¶ 6.) She learned about the open dispatcher position with the Police Department from a client, New Berlin Police Officer Jean Morris ("Morris"). (DPFOF ¶ 7.)

The plaintiff applied for employment as a dispatcher with the Police Department on or about February 1, 2008. (DPFOF ¶ 5.) After completing the initial interview process, New Berlin Police Chief Joseph Rieder ("Rieder") contacted the plaintiff in July 2008 to inform her that the Police Department wanted to hire her to fill an open emergency dispatcher position. (DPFOF ¶ 10.) To complete the hiring process, the Police Department required the plaintiff to undergo a background check. (DPFOF ¶ 11.) This task was delegated to Saftig, a police officer with the Police Department. (DPFOF ¶¶ 2, 15.)

The Police Department conducts background investigations of all prospective candidates for employment. (DPFOF ¶ 12.) The background investigations involve interviews with the prospective candidate, screening of her prior employment history, and scrutiny of her financial status. (DPFOF ¶ 12.) The investigations also include contact with neighbors, acquaintances, and employers, as well as medical screenings and examinations. (DPFOF ¶ 12.)

The Police Department created a rule to protect the sensitive nature of information that members of the Police Department may learn during the discharge of their duties. (DPFOF ¶ 14.) One such rule, Rule 1.37 provides, in relevant part, as follows:

> Dissemination of Information. Personnel will treat the official business and records of the department as confidential. Information regarding official business and records will be disseminated only to those for whom it is intended, in accordance with established departmental procedures . . . . Personnel will not divulge the identity of persons giving confidential information except as authorized by proper authority.

(DPFOF ¶ 14.) This rule is applicable to the conduct of personal background checks on prospective employees. (DPFOF ¶ 14.)

4

Before her background check, the plaintiff consulted Morris regarding a gastric bypass surgery the plaintiff received in Mexico. (DPFOF ¶ 17.) The surgery resulted in a followup surgery in the United States due to surgical complications, and caused the plaintiff to have high credit card debt to pay for the surgeries, which were not covered by insurance. (DPFOF ¶ 17.) Morris felt the information would not be a problem as long as the plaintiff had paid her medical bills. (DPFOF ¶ 19.) Morris consulted her husband, without the plaintiff's permission, who is a Captain with the Police Department and he agreed that the financial issues surrounding the surgery would not be an issue in the hiring process. (DPFOF ¶ 20.)

She also told approximately two to four clients, in addition to Morris, about the circumstances surrounding the surgery in Mexico. (DPFOF ¶ 21.) The plaintiff also disclosed the gastric bypass procedure with Sherrie Callies and Shelly Haas, both of whom the plaintiff listed as references on her job application with the Police Department. (DPFOF ¶ 22.)

Lieutenant Jeff Hingiss ran the plaintiff's credit report before her interview with Saftig. (DPFOF ¶ 24.) Hingiss noticed a high level of personal debt. (DPFOF ¶ 24.) Hingiss provided this information to Saftig. (DPFOF ¶ 24.)

Saftig interviewed the plaintiff on or about July 11, 2008. (DPFOF ¶ 25.) During the course of the background interview, Saftig asked the plaintiff about the reasons for her high level of personal debt. (DPFOF ¶ 25.) The plaintiff told Saftig about the medical procedure in Mexico, which required further medical treatment in the United States. (DPFOF ¶ 25.) The procedure and the resulting treatment caused a high level of personal debt for the plaintiff because the procedure was elective and therefore not covered by insurance. (DPFOF ¶ 25.) The plaintiff told Saftig to limit her discussion of the information with only those who were involved in the employment decision-making process. (DPFOF ¶ 26.)

5

Medical bills and medical information obtained during the background investigation process are to be shared only with those departmental personnel who are in a "need to know" position. (DPFOF ¶ 27.) In the plaintiff's case, the people in the "need to know" position were Sergeant Park, Sergeant Godec, Captain Morris, Captain Zsohar, Chief Rieder and Lt. Hingiss. (DPFOF ¶ 27.) Saftig told Lt. Hingiss that the plaintiff's medical procedures were the reason for her high credit card debt. (DPFOF ¶ 27.)

During the background investigation, Saftig contacted the plaintiff's references, some of whom mentioned that the plaintiff had a gastric bypass surgery. (DPFOF ¶ 29.) Saftig did not initiate the topic during the conversation with the plaintiff's references. (DPFOF ¶ 29.)

During the background check process, but before Saftig initiated the plaintiff's medical background investigation, Saftig came into the dispatch center and spoke with dispatcher Sue Medrow ("Medrow"). (DPFOF ¶ 31.) Saftig stated that she had completed the background investigation, that she liked the plaintiff, and that she did not see any reason why the plaintiff would not be hired. (DPFOF ¶ 31.) Saftig stated that the plaintiff told Saftig that during the background check, they would find out she had a loan or was in debt because of her stomach surgery in Mexico, which resulted in complications. (DPFOF ¶ 31.) Saftig stated that the plaintiff said she had to have the procedure redone and that insurance did not cover the procedure. (DPFOF ¶ 31.) Because the plaintiff could not immediately pay for the procedures, she incurred debt. (DPFOF ¶ 31.) Dispatchers Kathleen Bazinski and Jeri Davis were also present when Saftig made the statement. (DPFOF ¶ 32.)

After completing a second interview, and upon completion of the investigatory process, the Police Department hired the plaintiff and asked her to report to work on or about September 15, 2008. (DPFOF ¶¶ 41–42.)

6

On the plaintiff's first day of work, Chief Rieder told the plaintiff that the Police Department was investigating whether the plaintiff's personal information had been impermissibly disclosed within the Police Department, beyond the limited authorized personnel. (DPFOF ¶ 43.) Chief Rieder asked the plaintiff to cooperate with the Police Department investigation and to continue to report for duty during the investigation. (DPFOF ¶ 43.) Lt. Hingiss conducted this investigation. (DPFOF ¶ 44.) Based on the information in Lt. Hingiss's investigation report, Chief Rieder issued charges against Saftig on October 31, 2008, with the City of New Berlin Police and Fire Commission. (DPFOF ¶ 45.) He alleged violations of the rules and expectations of the department, specifically Rule 1.37, regarding the dissemination of information, and Rule 1.11, regarding satisfactory performance. (DPFOF ¶ 45.)

The training for the dispatcher position was very stressful for the plaintiff. (DPFOF ¶ 48.) The plaintiff had trouble performing the multi-tasking scenarios presented to her as a dispatcher trainee. (DPFOF ¶ 48.) She had never experienced the kind of multi-tasking required in the dispatch center. (DPFOF ¶ 48.) She did not like the methods her trainer on second shift used, including yelling, ridiculing, and belittling. (DPFOF ¶ 49.) Her workplace stress was also caused and complicated by Saftig's disclosure of the plaintiff's personal information to other dispatchers. (DPFOF ¶ 48; Pl.'s Dep. pp. 93–96.)

In February 2009, the plaintiff began seeing a therapist to deal with workplace stress. (DPFOF ¶ 50; Bonjean Dep. p. 79.) The plaintiff discussed her workplace stress with the therapist. (DPFOF ¶ 50.) Her workplace stress included, but is not limited to: the dissemination of her personal information; the treatment she received by her superiors and co-workers; the anxiety of not knowing if her job was secure; and the Police and Fire Commission hearing commencing as she was attempting to learn a new job. (DPFOF ¶ 50.)

7

The plaintiff decided to withdraw from her position as a dispatcher. (DPFOF ¶ 51.) She asked Chief Rieder if another position may be opening within the Police Department. (DPFOF ¶ 51.) The plaintiff hoped to continue working with the Police Department, possibly in a customer service position. (DPFOF ¶ 51.) She ceased her employment with the Police Department in May 2009. (DPFOF ¶ 5.)

The New Berlin Police and Fire Commission disciplinary hearings of Saftig were reported to the Milwaukee Journal Sentinel and were discussed on talk radio. (DPFOF ¶ 59.) The plaintiff was embarrassed because people began contacting her to ask if she was the subject of the story. (DPFOF ¶ 59.) However, the plaintiff's name was never disclosed in the paper or on the radio. (DPFOF ¶ 60.)

## III. SUMMARY JUDGMENT STANDARD

A district court shall grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

8

materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). However, a mere scintilla of evidence in support of the nonmovant's position is insufficient. *See Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)).

## IV.  DISCUSSION

The plaintiff asserts several federal and state law claims, all stemming from Saftig's disclosure of the plaintiff's personal information. The court will first address the plaintiff's federal claims, and then move to the plaintiff's state law claims.

### A.  Federal Claims

The defendants argue that they are entitled to summary judgment on all three of the plaintiff's federal claims under the Fourteenth Amendment and the FCRA. The defendants assert that the plaintiff alleges no facts that support her federal claims. Additionally, the defendants argue that even if such facts were alleged, Saftig is protected from a lawsuit for damages by the doctrine of qualified immunity. Because Saftig has asserted immunity, the court will analyze the plaintiff's federal claims using the

9

framework provided by the doctrine of qualified immunity.[2]

"The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). To determine whether a government official is entitled to qualified immunity, the court must decide whether (1) the facts the plaintiff has alleged or shown demonstrate a federal statutory or constitutional violation and (2) the statutory constitutional right at issue was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Although the privilege of qualified immunity is an affirmative defense, the plaintiff bears the burden of defeating it once raised. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). Thus, the plaintiff must not only demonstrate deprivation of a federal statutory or constitutional right, but she must also show that the right was clearly established. To demonstrate that a right is clearly established, the plaintiff must either (1) present a case that has articulated the right at issue and applied it to similar factual circumstances as the case at hand or (2) demonstrate that the "contours of the right are so established as to make the unconstitutionality obvious." *Boyd v. Owen*, 481 F.3d 520, 526–27 (7th Cir. 2007).

Using the framework described above, the court will now address the plaintiff's federal claims.

### 1. The Fair Credit Reporting Act

The defendants argue that the plaintiff "does not have a cause of action under the FCRA because Defendants do not qualify as consumer reporting agencies." (Defs.' Br. 5.) However, the Seventh Circuit

---

[2] Neither party disputes Saftig's status as a state actor. Thus, for the purposes of qualified immunity, the court will assume that Saftig was acting under color of law during the alleged unlawful disclosure.

cases the defendants rely on for this assertion were published before Congress amended the FCRA to extend civil liability to *users* of consumer reports. Specifically, Congress amended the FCRA in 1996, with an effective date of September 30, 1997, adding section 1681b(f), which forbids using or obtaining a consumer report for impermissible purposes. 15 U.S.C. § 1681b(f). Based on this amendment, "the FCRA now imposes liability for using or obtaining a consumer report in violation of the FCRA, not simply for releasing or disseminating a report." *Cole v. U.S. Capital*, 389 F.3d 719, 731 n.14 (7th Cir. 2004).

Section 1681b(f) of the FCRA provides the following:

> **Certain use or obtaining of information prohibited.** A person shall not use or obtain a consumer report for any purpose unless–
>
>> (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
>>
>> (2) the purpose is certified in accordance with section 607 [15 USCS § 1681e] by a prospective user of the report through a general or specific certification.

15 U.S.C. § 1681b(f). A person who negligently or willfully fails to comply with the FCRA with respect to a consumer is potentially liable to that consumer for actual damages, attorneys' fees, and costs. 15 U.S.C. §§ 1681n–o. Based on the statute and the relevant case law, the court finds that the FCRA clearly applies to "users" of consumer reports, not merely consumer reporting agencies, as the defendants contend.

Because the statute applies to "users" of consumer reports, not merely consumer reporting agencies, the defendants may be liable if Saftig "used" or "obtained" the plaintiff's consumer report in violation of the FCRA. Courts in other circuits have imposed three requirements that the plaintiff must establish to prevail on a claim of improper use or acquisition of a consumer report: (1) "there was a

11

'consumer report' within the meaning of the statute;" (2) "the defendant used or obtained it;" and (3) "the defendant did so without a permissible statutory purpose." *McFarland v. Bob Saks Toyota, Inc.*, 466 F. Supp. 2d 855, 867 (E.D. Mich. 2006). *See also Phillips v. Grendahl*, 312 F.3d 357, 364 (8th Cir. 2002), abrogated on other grounds by *Safeco Ins. of Am. v. Burr*, 551 U.S. 47 (2007); *Godby v. Wells Fargo Bank, N.A.*, 599 F. Supp. 2d 934, 938 (S.D. Ohio 2008). In applying this test, there is no dispute that a "consumer report" existed. However, the parties dispute whether Saftig used the consumer report without a permissible purpose.

The FCRA provides several enumerated "permissible purposes" under section 1681b(a). The list is exhaustive and no other purposes are permitted. Section 1681b(a) includes as a permissible purpose "us[ing] the information for employment purposes." 15 U.S.C. § 1681b(a)(3)(B). This would appear to protect the defendants because the consumer report was obtained and used for an employment purpose. However, the act alleged here–Saftig's discussion of the plaintiff's financial issues with coworkers–is not included in the list of enumerated permissible purposes. Because it is not listed, it is an impermissible purpose and Saftig may not "use" a consumer report for this purpose without violating the FCRA. Drawing inferences in the light most favorable to the nonmoving party, the court finds that the evidence presented is sufficient for a jury to reasonably conclude that Saftig used the report for an impermissible purpose–to discuss the plaintiff's stomach surgery as a topic of interest among coworkers–which violates the FCRA.

Because the plaintiff has established that a jury could reasonably find that Saftig's alleged actions violated a federal statutory right, the court will turn to the second prong of the qualified immunity analysis and determine whether the federal statutory right was "clearly established" at the time of the conduct at issue. If not, Saftig is entitled to qualified immunity.

12

In *Cole v. U.S. Capital*, 389 F.3d 719, 731 n.14 (7th Cir. 2004), the defendants made the argument that the FCRA only imposes liability for the dissemination of consumer reports by consumer reporting agencies, making the FCRA inapplicable to the defendants in that case. The court noted that every circuit to address the issue recognized that the FCRA includes § 1681b(f), making it clear that "the FCRA now imposes liability for using or obtaining a consumer report in violation of the FCRA, not simply for releasing or disseminating a report." *Id*. This case demonstrate that as early as 2004, the contours of the right were clearly established, making a violation by a "user" of consumer reports obvious.

The plaintiff has provided sufficient facts to demonstrate that a federal right does exist, that the right was possibly violated in this case, and that the right was clearly established at the time of the incident. The plaintiff has therefore demonstrated that Saftig is not entitled to qualified immunity with respect to the FCRA claim. Thus, the court will deny the defendants' motion for summary judgment as to the plaintiff's claim that Saftig violated the FCRA.

### 2. Due Process

Beginning under the first prong of the qualified immunity test, the court finds the plaintiff unable to demonstrate a violation of her right to due process under the Fourteenth Amendment. Additionally, under the second prong, the court finds that the right to informational privacy was not clearly established at the time of the incident. The court will therefore grant the defendants' motion for summary judgment with regard to the plaintiff's federal due process claim.

The Fourteenth Amendment guarantees "due process of law" for any deprivation of "life, liberty, or property." With regard to deprivation of "liberty," the Fourteenth Amendment forbids government infringement on fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling interest. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). One such interest includes

13

the right to privacy. *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977).

In *Whalen v. Roe*, the Court held that a statute requiring the state to maintain records regarding for whom physicians prescribed specific dangerous, yet lawful, drugs, did not invade any constitutional right to privacy. *Id*. However, the Court implied "that the disclosure by or under the compulsion of government of a person's medical records might invade a constitutional right of privacy." *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir. 1995). *See also Nixon v. Adm'r of Gen. Serv.*, 433 U.S. 425, 457 ("One element of privacy has been characterized as 'the individual interest in avoiding disclosure of personal matters . . . .'") (quoting *Whalen*, 429 U.S. at 599).

The Seventh Circuit explained its interpretation of *Whalen*. Specifically, the court stated:

> The courts of appeals, including this court, have interpreted *Whalen* to recognize a constitutional right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information–information that most people are reluctant to disclose to strangers–and have held that the right is defeasible only upon proof of a strong public interest in access to or dissemination of information.

*Wolfe v. Schaefer*, 619 F.3d 782, 785 (7th Cir. 2010). *See also Denius v. Dunlap*, 209 F.3d 944, 957–58 (7th Cir. 2000) (finding that some types of medical and financial information "involve the degree and kind of confidentiality that is entitled to a measure of protection under the federal constitutional right of privacy.")

In *Denius v. Dunlap*, an employee was required to sign an authorization for release of personal information, which would include records relating to education, finance, criminal history, and employment history. *Id*. at 948–49. The employee refused to sign the authorization and his refusal was "the sole reason his employment contract . . . was not renewed." *Id*. at 949. The court held that medical records and communications and some forms of financial information are "entitled to a measure of protection under the federal constitutional right of privacy." *Id*. at 956–58. However, the court affirmed

14

the district court's grant of summary judgment on the financial privacy claim because the right was not clearly established at the time of the incident, entitling the defendant to qualified immunity. *Id*. at 958. The court reversed and remanded the medical privacy issue, finding that a right to privacy in medical records and information was clearly established when the plaintiff was asked to sign the authorization. *Id*. at 956–57.

In *O'Neal v. Coleman*, No. 06-C-243-C, 2006 WL 1706426, at *1 (W.D. Wis. June 16, 2006), the petitioner, O'Neal, pled guilty to a charge of attempted robbery. As part of O'Neal's probation, he was required to reside in a drug and alcohol treatment facility. *Id* at *2. The facility requested O'Neal's medical records to substantiate his prior injuries. *Id*. O'Neal initially refused to turn over his records, but the facility eventually obtained the records necessary for his treatment. *Id*. O'Neal argued that the respondent's request for medical records violated his due process right to privacy of medical information. *Id*. at *9. The court disagreed, stating that "[t]he Constitution's protection of private, personal information applies only where an individual seeks to *prevent* the government from releasing, using or otherwise exploiting that information." *Id*. at *10. The court noted that O'Neal authorized the disclosure of his medical information to the respondent, even though O'Neal felt he was "forced to turn over his medical records." *Id*. The court further explained that "[a] different case would be presented if a state agency had obtained petitioner's medical information without his consent." *Id*.

In the context of an informational privacy claim, citizens are protected from compelled disclosure of private information by the government, unless the government can demonstrate a sufficiently strong state interest and protection against wide dissemination. *Denius*, 209 F.3d at 956; *Schaill*, 864 F.2d at 1322. The facts necessary to assert such a claim are not present here. The plaintiff does not argue that the Police Department's requirement that she provide confidential information is a violation of her due

15

process right to informational privacy. In fact, the plaintiff consented to a background check, which included the release of private financial information to the Police Department. Additionally, in the interview, the plaintiff volunteered her medical history to Saftig in an attempt to explain the debt evident from her credit report. At no time was the plaintiff compelled by the government to provide private financial and medical information.[3] Additionally, Saftig did not have access to the plaintiff's medical records or history prior to the alleged disclosure. Thus, the plaintiff has failed to demonstrate a constitutional violation and therefore has failed to meet the first prong of the qualified immunity test.

Additionally, the Supreme Court's recent decision in *NASA v. Nelson*, 131 S. Ct. 746 (2011) demonstrates that a right to informational privacy is not clearly established. In *NASA*, the respondents asserted violations of their informational privacy right created under *Whalen* and *Nixon*. *Id*. at 751. The Court bypassed the issue, however, stating "[w]e assume, without deciding, that the Constitution protects a privacy right of the sort mentioned in *Whalen* and *Nixon*" *Id*. After assuming the right existed, the Court found that if such a right did exist, it was not violated by the defendants in that case.[4] *Id*.

Justice Scalia disagreed with the majority's approach. He argued that the Court should instead hold that no constitutional right to informational privacy exists. *Id*. at 765. He supported this assertion by stating:

---

[3] An argument can be made that without consenting to a background check the plaintiff would be foreclosed from obtaining the open dispatcher position. However, this does not rise to the level of compelled disclosure. *See Schaill by Kross v. Tippecanoe Cnty. Sch. Corp.*, 864 F.2d 1309, 1322 (7th Cir. 1988) (upholding a urinalysis program requiring students to disclose confidential information, including the use of prescription medications in order to rebut positive results because the information need only be disclosed upon a positive urine result and there was no evidence that the information would be widely disseminated).

[4] In the three cases decided by the Court regarding a right to informational privacy (*Whalen*, *Nixon*, and *NASA*), the Court has not found any conduct violative of this assumed right.

16

Our due process precedents, even our "substantive due process" precedents, do not support *any* right to informational privacy. First, we have held that the government's act of defamation does not deprive a person "of any 'liberty' protected by the procedural guarantees of the Fourteenth Amendment." *Paul v. Davis*, 424 U.S. 693, 709, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976). We reasoned that stigma, standing alone, does not "significantly alte[r]" a person's legal status so as to "justif[y] the invocation of procedural safeguards." *Id.*, at 708–709, 96 S. Ct. 1155. If outright defamation does not qualify, it is unimaginable that the mere disclosure of private information does.

*Id.* (emphasis original).

As the defendants point out, the decision in *NASA v. Nelson*, 131 S. Ct. 746 (2011) demonstrates that a constitutional right to informational privacy is not clearly established. Instead, the Court has not fully addressed the contours of the right to informational privacy and at least one Justice believes that no such right exists.

Additionally, the plaintiff has failed to point to a case where the right is recognized and is applied to similar facts as the present case. The plaintiff cites *Denius v. Dunlap* as "particularly compelling in [the plaintiff]'s case." (Pl.'s Resp. 4.) However, *Denius* involved a compelled disclosure of information that the plaintiff wanted to keep private. *Denius*, 209 F.3d at 955. In this case, the plaintiff voluntarily released financial information to the Police Department and voluntarily released medical information to Saftig during the interview. At no time does the plaintiff allege that she was compelled to disclose information. Thus, the facts are not clearly analogous to demonstrate that a right was clearly established through the court's decision in *Denius*.

Based on the discussion above, the plaintiff is unable to carry her burden of demonstrating that Saftig violated a constitutional right and that a constitutional right to informational privacy was clearly established at the time of the alleged violation. By failing to meet either prong of the qualified immunity analysis, the plaintiff is unable to defeat Saftig's affirmative defense of qualified immunity. Thus, Saftig

17

is shielded from suit with regard to the plaintiff's federal due process claim by the doctrine of qualified immunity. I will therefore grant the defendants' motion for summary judgment as it relates to the plaintiff's claim that Saftig violated the plaintiff's due process rights secured by the Fourteenth Amendment.

### 3. Equal Protection

In evaluating the plaintiff's equal protection claim, I will begin with the first prong of the qualified immunity analysis by determining whether Saftig violated plaintiff's constitutional right to equal protection under the law, as provided by the Fourteenth Amendment.

To prevail on her claim that Saftig violated the Equal Protection Clause, the plaintiff must show that "the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). To establish discriminatory effect, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she is otherwise similarly situated to members of the unprotected class; and (3) the defendant treated the plaintiff different than members of the unprotected class. *Id*. at 636. The second element, discriminatory purpose, requires a showing that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

The plaintiff alleges that Saftig discriminated against her based on her gender. Specifically, the plaintiff argues that Saftig's disclosure of private information has a discriminatory effect because "women applicants, like [the plaintiff], who experienced certain types of procedures would suffer the risk of revelation of their personal medical histories while male applicants would not." (Pl.'s Resp. 11.)

18

As a preliminary matter, the plaintiff has adequately demonstrated that she is a member of a protected class. However, the two remaining requirements of the discriminatory effect test are lacking. First, the plaintiff has failed to show that other similarly situated persons outside the protected class were treated differently with regard to personal information. Instead, the plaintiff argues that Saftig's behavior could potentially result in such discrimination. She does not, however, point to specific instances besides her own. Nor does the plaintiff allege that she is a "class of one" and was therefore discriminated against due to animosity between the plaintiff and Saftig. Without pointing to a single case of similar or dissimilar treatment, the court cannot draw any reasonable inferences that the plaintiff was discriminated against due to her membership in a protected class.

Additionally, there is no evidence that Saftig acted with a discriminatory intent, which is the second element of the test. Discriminatory intent may be shown through direct proof or by utilizing the indirect method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Williams v. Seniff*, 342 F.3d 774, 788 n. 13 (7th Cir. 2003) ("Our cases make clear that the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection."). In using the indirect method, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence, "which creates a presumption that the employer unlawfully discriminated against the plaintiff." *Id*. at 788. The burden then shifts to the employer to offer a legitimate nondiscriminatory reason for the action alleged to be discriminatory, in this case disclosure of personal information. *Id*. The plaintiff must then establish that the proffered reasons are pretextual. *Id*.

Here, the plaintiff must show that Saftig disclosed the plaintiff's personal information specifically because of the adverse effect it would have on a specific class of citizens, in this case women, in order to demonstrate a prima facie case of discrimination. However, the plaintiff cannot establish this through

19

the record.  First, Saftig is a member of the same protected class.  Second, the comments were made to another woman in the presence of others.  Third, the comments do not demonstrate a desire to discriminate against women or to perpetuate further discrimination.  Further, the plaintiff does not point to any facts that would allow a reasonable inference that such a discriminatory effect was intended.  Thus, the court finds that the plaintiff is unable to establish a prima facie case of a violation of her equal protection rights guaranteed by the Fourteenth Amendment.

Because the plaintiff is unable to demonstrate the existence of a prima facie case of discrimination based on her gender, the *McDonnell Douglas* burden-shifting analysis ends.  The plaintiff is therefore unable to establish the second required element of discriminatory intent.  Based on the undisputed facts, the plaintiff cannot establish that Saftig violated her right to equal protection.  Under the qualified immunity framework, the plaintiff is unable to demonstrate a constitutional violation.  It is therefore unnecessary to evaluate whether the constitutional right was "clearly established" under the second prong of the analysis.  Thus, the court finds that Saftig is entitled to qualified immunity and will therefore grant the defendants' motion for summary judgment with regard to this claim.

## B.  State Law Claims

The defendants state that the plaintiff's state law claims lack merit and should therefore be dismissed.  They further assert that if the plaintiff has a claim, Saftig is shielded from suit by the doctrine of discretionary act immunity.  If the defendants are correct in their assertion that Saftig is entitled to protection from suit for damages due to discretionary act immunity, then analysis of the viability of the state claims would be unnecessary.  Therefore, the court will first address whether Saftig is entitled to discretionary act immunity before proceeding to the substance of the plaintiff's state law claims.

As a general rule, state officers and employees are immune from personal liability for injuries

20

resulting from acts performed within the scope of their official duties. Wis. Stat. § 893.80(4); *Lister v. Bd. of Regents*, 240 N.W.2d 610, 621 (Wis. 1976). However, an officer or employee may be liable for damages based on (1) the negligent performance of a ministerial duty; (2) conduct that is malicious, willful, and intentional; and (3) awareness of a danger of such a character that the officer's duty to act becomes "absolute, certain and imperative." *Barillari v. City of Milwaukee*, 533 N.W.2d 759, 763 (Wis. 1995) (internal citations omitted). "The immunity defense assumes negligence, focusing instead on whether the municipal action (or inaction) upon which liability is premised is entitled to immunity under the statute, and if so, whether one of the judicially-created exceptions to immunity applies." *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 17, 253 Wis. 2d 323, 646 N.W.2d 314 (Wis. 2002).

The plaintiff argues that Saftig is not protected by governmental immunity because she was performing a ministerial duty imposed by law and because her acts were malicious, willful, and intentional. The court agrees that Saftig was performing a ministerial duty and will therefore find that Saftig is not entitled to discretionary act immunity.

"A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister*, 240 N.W.2d at 622. *See Scarpaci v. Milwaukee County*, 292 N.W.2d 816, 826–28 (Wis. 1980) (governmental immunity attaches to medical examiner's decision to conduct autopsy, but not to manner in which autopsy is performed). Additionally, "governmental immunity depends on the nature of the specific act on which liability is based, not on the general duties of the public officer." *C.L. v. Olson*, 409 N.W.2d 156, 158 (Wis. Ct. App. 1987).

Here, Saftig allegedly disclosed private information learned through the course of her interview

with the plaintiff. Although the decision to ask certain questions may have been discretionary, her duties with regard to confidential information of interviewees was not. In fact, the Police Department maintains a rule intended to protect dissemination of private information. Rule 1.37 provides as follows:

> Dissemination of Information. Personnel will treat the official business and records of the department as confidential. Information regarding official business and records will be disseminated only to those for whom it is intended, in accordance with established departmental procedures . . . . Personnel will not divulge the identity of persons giving confidential information except as authorized by proper authority.

(DPFOF ¶ 14.) This rule is applicable to background checks on prospective employees. (DPFOF ¶ 14.)

Rule 1.37 demonstrates that Saftig did not have discretion to choose whether or not to disseminate private information. She is required to follow the letter of the rule, and maintain information in confidence. There is no room for discretion on whether Saftig may disclose private information to those for whom the information is not intended. This demonstrates that Saftig's duty to maintain confidential information in confidence is a ministerial duty. Therefore, Saftig is not entitled to discretionary act immunity for the act alleged in this case.

Because the court finds that Saftig is not entitled to discretionary act immunity under the "ministerial duty" exception, there is no need to address the plaintiff's argument that Saftig is not entitled to immunity because her actions were malicious, willful, and intentional. Having concluded that Saftig is not entitled to protection from suit under the doctrine of discretionary act immunity, the court will now address the merits of the plaintiff's state law claims.

*1. Invasion of Privacy - § 995.50(2)(a) & (c)*

The plaintiff alleges that the Saftig invaded her privacy in violation of Wis. Stat. § 995.50(2)(a) and (c). The relevant portions of the statute read as follows:

In this section, "invasion of privacy" means any of the following:

22

(a) Intrusion upon the privacy of another of a nature highly offensive to a reasonable person, in a place that a reasonable person would consider private or in a manner which is actionable for trespass.

. . .

(c) Publicity given to a matter concerning the private life of another, of a kind highly offensive to a reasonable person, if the defendant has acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter involved, or with actual knowledge that none existed. It is not an invasion of privacy to communicate any information available to the public as a matter of public record.

Wis. Stat. § 995.50(2).

The defendants first argue that section (2)(a) does not apply to this action because "[t]his case involves no intrusion into any place."[5] I agree. *See Hillman v. Columbia Cnty.*, 474 N.W.2d 913, 919 (Wis. Ct. App. 1991) (holding that "place" is limited to a geographical meaning and "does not include a file of medical records."); *see also Fischer v. Mt. Olive Lutheran Church*, 207 F. Supp. 2d 914, 928 (W.D. Wis. 2002) (finding that an intrusion to a "place" can mean a person's private belongings if the belongings intruded upon would be considered private by a reasonable person.) The plaintiff's assertion that Saftig disclosed private information obtained through her credit report and through a conversation with Saftig does not involve an intrusion into a private "place." Because the plaintiff cannot assert and has not asserted a privacy interest in a private "place" or private "belongings," the court will grant the defendants' motion for summary judgment with regard to the plaintiff's claim that the defendants violated Wis. Stat. § 995.50(2)(a).

When bringing a claim for invasion of privacy under Wis. Stat. § 995.50(2)(c), the plaintiff must establish four elements: (1) public disclosure of facts regarding the plaintiff; (2) the facts disclosed are

---

[5] The plaintiff fails to even address this argument in her response. Instead, she argues only that the Saftig violated section (2)(c) of the statute.

Case 2:09-cv-01176-WEC   Filed 05/11/11   Page 23 of 34   Document 71

private facts; (3) the private matter made public is one that would be highly offensive to a reasonable person of ordinary sensibilities; and (4) the defendant acted unreasonably or recklessly as to whether there was a legitimate public interest in the matter, or with actual knowledge that none existed. *Zinda v. Louisiana Pac. Corp.*, 440 N.W.2d 548, 555 (Wis. 1989).

Here, the defendants argue that the facts disclosed are not private facts and also that a reasonable person could not find Saftig's statements highly offensive. (Defs.' Br. 14.)

A person's medical care and treatment are generally considered private matters. *See Pachowitz v. Ledoux*, 2003 WI App 120, ¶ 12, 265 Wis. 2d 631, 666 N.W.2d 88 (Wis. Ct. App. 2003) (jury found disclosure of plaintiff's medical condition to one person violated the plaintiff's right of privacy); *Hannigan v. Liberty Mut. Ins. Co.*, No. 98-2643, 1999 WL 667303, at *11 (Wis. Ct. App. Aug. 26, 1999) ("A person's health care and treatment records are generally considered private and confidential . . . and thus may constitute 'private' facts."). Additionally, "[a]n invasion of a plaintiff's right to privacy is important if it exposes private facts to a public whose knowledge of those facts would be embarrassing to the plaintiff." *Pachowitz*, 2003 WI App 120, ¶ 23 (quoting *Beaumont v. Brown*, 257 N.W.2d 522, 531 (Mich. 1977)).

The defendants argue that the plaintiff shared the alleged "private facts" to many others in the community and that her disclosure to others demonstrates that the medical procedure was not a "private fact" deserving of protection under Wis. Stat. § 995.50(2)(c). The plaintiff argues, however, that her disclosure of the medical procedure was not widespread and instead was only discussed with a limited number of people, with the understanding that the information was confidential and private.

The issue of whether the information allegedly disclosed is private is not for the court to decide. There are factual disparities that render such a decision more appropriate for a jury. *See Schauer v.*

24

*Thornton*, No. 98-1180, 1999 WL 642946, at *10 (Wis. Ct. App. Aug. 25, 1999) (finding that the public's knowledge of the alleged "private facts" was a factual issue for the jury.) As mentioned above, the parties dispute the private nature of the plaintiff's medical treatment. Looking at the facts most favorably to the plaintiff, a reasonable person could find that the plaintiff's medical procedures and financial difficulties caused as a result of the medical procedure are "private facts" entitled to protection under Wis. Stat. § 995.50(2)(c).

Additionally, the defendants assert that the plaintiff is unable to prove the third element of invasion of privacy. The third element of the prima facie case of invasion of privacy is that "the private matter made public must be one which would be highly offensive to a reasonable person of ordinary sensibilities." *Zinda*, 440 N.W.2d at 555. Private facts are considered highly offensive where a reasonable person would be justified in feeling seriously aggrieved by the information being disclosed. *Id.*

Based on the facts of the case, the disclosure of the information could be considered highly offensive by a reasonable person of ordinary sensibilities. Saftig allegedly disclosed the plaintiff's medical history and ensuing financial difficulties to the plaintiff's coworkers. A reasonable person could find such a disclosure highly offensive. Because an evaluation of the private nature of the facts and the offensiveness of the disclosure are factual inquiries best resolved by the jury, the court will deny the defendants' motion for summary judgment with regard to this claim.

### 2. Intentional Infliction of Emotional Distress

Under Wisconsin law, to recover damages for intentional infliction of emotional distress, a plaintiff must show: (1) the defendant's conduct was intentional, that is, the defendant behaved as she did for the purpose of causing emotional distress; (2) the defendant's conduct was extreme and

25

outrageous; (3) the defendant's conduct caused the injury; and (4) the plaintiff suffered an extreme and disabling emotional response to the conduct. *Alsteen v. Gehl*, 124 N.W.2d 312, 318 (Wis. 1963).

To establish intent, "[t]here must be something more than a showing that the defendant intentionally engaged in the conduct that gave rise to emotional distress in the plaintiff; the plaintiff must show that the conduct was engaged in for the purpose of causing emotional distress." *Rabideau v. City of Racine*, 2001 WI 57, ¶ 36, 243 Wis. 2d 486, 627 N.W.2d 795 (Wis. 2001). Intent may be inferred from words, conduct, or the circumstances in which the events occurred. *Id*.

The defendants assert that Saftig harbored no animosity toward the plaintiff and that "Saftig stated that she liked the [p]laintiff." The plaintiff cites to statements made by those involved in the disclosure that Saftig acted "intentionally" and that she disclosed information as "girl talk." However, the plaintiff fails to offer facts that Saftig behaved as she did for the *purpose* of causing emotional distress for the plaintiff. The plaintiff argues instead that "Saftig made the disclosures for no good reason but rather to disclose for the sake of her own titillation." (Pl.'s Resp. 13.) The "reason" for Saftig's disclosure must be to emotionally injure the plaintiff. Based on the record presented, no reasonable jury could find that Saftig intended to cause the plaintiff emotional distress. Thus, the plaintiff cannot establish this element of intentional infliction of emotional distress.[6]

Although the plaintiff must establish all four elements to prevail on her claim for intentional infliction of emotional distress, and thus failing to establish intent causes the claim to fail, the court will still address the three remaining elements for sake of completeness.

---

[6] Summary judgment of a claim is typically inappropriate where issues of motive or intent are involved. *Ashman v. Burrows*, 438 F.3d 781, 784 (7th Cir. 2006). However, where "a plaintiff fails to establish any motive or intent to support his position, summary judgment is appropriate." *Roger v. Yellow Freight Sys.*, 21 F.3d 146, 148 (7th Cir. 1994).

26

The second element of intentional infliction of emotional distress is that the defendant's conduct would be considered extreme and outrageous by an "average member of the community." *Bowen v. Lumbermens Mut. Cas. Co.*, 517 N.W.2d 432, 437 (Wis. 1994). "This is a high standard, and Wisconsin courts have been reluctant to find conduct sufficiently extreme to meet this test." *Kennedy v. Children's Serv. Soc'y of Wis.*, 17 F.3d, 980, 987 (7th Cir. 1994). To reach this high standard, the plaintiff must show that an "average member of the community" would find that the conduct at issue caused a complete denial of the plaintiff's dignity as a person. *Gianoli v. Pfleiderer*, 563 N.W.2d 562, 567 (Wis. Ct. App. 1997). "Mere carelessness or bad manners is insufficient." *Id*.

For example, in *Gianoli v. Pfleiderer*, the defendants and plaintiffs were adjacent property owners. *Id*. The defendants sent "negative and unflattering information concerning the [plaintiffs] to lenders and others" in an attempt to derail the plaintiffs' attempt to refinance their home. *Id*. The defendants also participated in near constant surveillance and harassment of the plaintiffs. *Id*. The court therefore upheld the trial court's finding that the defendants' behavior was extreme and outrageous. *Id*. *See also Laska v. Steinpreis*, 231 N.W.2d 196, 204 (Wis. 1975) (upholding trial court's decision that respondents' harassment, eavesdropping, and driving automobile onto appellant's lawn were neither extreme nor outrageous.)

The circumstances of this case raise factual issues as to whether Saftig's behavior rises to the level required by Wisconsin courts. Here, Saftig disclosed information about the plaintiff's surgery and debt to three persons working in the dispatch room. There is no evidence presented by either party that Saftig continued to disclose the personal information to others beyond these three persons. Nor is there evidence that Saftig harassed or bothered the plaintiff with the information. However, because a reasonable jury could find the disclosure of medical and financial information to coworkers to be extreme

27

and outrageous, the court would leave this issue to the jury if the plaintiff could meet the other three elements of the claim.

To prove the third element, causation, "[t]he plaintiff must demonstrate that the defendant's conduct was the cause-in-fact of his injury." *Alsteen*, 124 N.W.2d at 318. There are material issues of fact as to what actually caused the plaintiff's emotional issues. The defendants argue that it was a result of her high-stress position as a dispatcher. The plaintiff argues that it is a result of the alleged disclosure and the uncomfortable work atmosphere after the alleged disclosure. Thus, this issue would belong to the jury if the plaintiff could meet the other three elements of the claim.

The final element necessary to establish a claim of intentional infliction of emotional distress is that the conduct at issue caused the plaintiff to suffer an extreme and disabling emotional response. Such a response must be of a substantial or enduring quality that "no reasonable person could be expected to endure it." *Evrard v. Jacobson*, 342 N.W.2d 788, 791 (Wis. Ct. App. 1983). The distress must cause the plaintiff to be unable to function in other relationships. *Gianoli*, 536 N.W.2d at 568. If the conduct causes merely temporary discomfort, then the response is not extreme and disabling. *Id*.

The plaintiff states that she experienced embarrassment, humiliation, confusion, anxiety and depression. (Pl.'s Resp. DPFOF ¶ 50.) She began seeing a therapist to deal with her emotional distress. (Pl.'s Resp. DPFOF ¶ 50.) The plaintiff also states that "I was withdrawing from my social life; I didn't want to deal with any of my friends, my family; I backed out of every situation I could have. I just wanted to be in my house and I was having a lot of anxiety." (Pl.'s Dep. pp. 93–94.)

The defendants assert that any therapy the plaintiff sought was in response to stress caused by the plaintiff's job, not by Saftig's alleged disclosures. (Defs.' Br. 16–17.) Further, they assert that the plaintiff's emotional response could not have been extreme and disabling because the plaintiff continued

28

working for the Police Department from September 15, 2008 until May 8, 2009.  (Defs.' Br. 17.)

Based on the evidence, there are material issues of fact as to whether the plaintiff suffered an extreme and disabling response to Saftig's disclosure of personal information.  Thus, this issue would properly belong to the jury if the plaintiff were able to establish the remaining three elements.

In conclusion, the court finds that the plaintiff is able to demonstrate issues of material fact with regard to three of the four elements.  However, based on the undisputed facts, the plaintiff is unable to establish the element of "intent."  The court will therefore grant the defendants' motion for summary judgment regarding the plaintiff's claim of intentional infliction of emotional distress.

### 3. Negligent Infliction of Emotional Distress

In her response to the defendants' motion for summary judgment, the plaintiff asserts negligent infliction of emotional distress alongside her claim for intentional infliction of emotional distress.  (Pl.'s Resp. 13.)  Because the plaintiff did not assert this claim in her amended complaint, the court will not address the validity of such claim.  *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.")

### 4. Violations of the Wisconsin Constitution

In her amended complaint, the plaintiff asserts violations of "the due process and equal protection provisions of Article I §§ 1, 9 and 22 of the Wisconsin Declaration of Rights."  However, in her response to the defendants' motion for summary judgment, the plaintiff states that she "waives her §§ 9 and 22 theories."  The court will therefore address only her claim that the defendants violated rights guaranteed by article I, section 1 of the Wisconsin Constitution.

Article I, section 1 provides the following:

29

> All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

Wis. Const. art. I, § 1.

The plaintiff and the defendants agree that the analysis with regard to the due process and equal protection clauses of the Fourteenth Amendment apply with equal vigor to the due process and equal protection provisions of article I, section 1 of the Wisconsin Constitution. *See State ex rel. Sonneborn v. Sylvester*, 132 N.W.2d 249, 252 (Wis. 1965). As stated above, the plaintiff is unable to establish a violation of a constitutional right under both the due process and equal protection provisions of the Fourteenth Amendment, demonstrating that the plaintiff is unable to establish a violation under the Wisconsin Constitution. Thus, the court will grant the defendants' motion for summary judgment with regard to the plaintiff's claim that Saftig violated her equal protection and due process rights guaranteed by article I, section 1 of the Wisconsin Constitution.

### 5. *Direct Action Insurance*

In her complaint, the plaintiff asserts a claim against Zurich as the party responsible for insuring the liabilities of Saftig and New Berlin, pursuant to Wis. Stat. § 803.04(2)(a). (Compl. ¶¶ 25–26.) This statute provides, in relevant part, as follows:

> In any action for damages caused by negligence, any insurer which has an interest in the outcome of such controversy adverse to the plaintiff . . . is by this section made a proper party defendant in any action brought by plaintiff in this state on account of any claim against the insured.

Wis. Stat. § 803.04(2)(a).

Additionally, Wisconsin has a direct action statute, Wis. Stat. § 632.24, which states as follows:

> Any bond or policy of insurance covering liability to others for negligence makes the

insurer liable, up to the amounts stated in the bond or policy, to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured.

The defendants argue that the Wisconsin statutes allowing a plaintiff to sue an insurance company apply only to claims involving a party's negligence. Here, the defendants argue that Zurich is not a proper party defendant because the plaintiff has not asserted any claims for negligence. They therefore ask that the court dismiss the case as it relates to Zurich.

"To the extent that the plaintiff asserts negligence claims (under state law) against the actual defendants, the 'direct action' statute also grants her the right to assert those claims directly against the actual defendants' insurers." *Gibson v. City of Glendale Police Dep't*, 786 F. Supp. 1452, 1455 (E.D. Wis. 1992). Further, the Seventh Circuit has stated that "[Wis. Stat. § 803.04(2)(a)], as it is captioned, is a negligence section applicable to insurers which permits insurers to be joined in a case where a claim is alleged against the insured, but the section unambiguously is limited to damage claims caused by negligence." *Rich Prod. Corp. v. Zurich Am. Ins. Co.*, 293 F.3d 981, 983 (7th Cir. 2002). *See also Casper v. Am. Int'l S. Ins. Co*, 2010 WI App 2, ¶ 25, 323 Wis. 2d 80, 779 N.W.2d 444 (Wis. Ct. App. 2009) ("Wis. Stat. § 632.24 allows a party to assert a negligence claim directly against an insurance company, in certain instances, irrespective of whether the insured has yet been found liable by a final judgment."). Thus, the Wisconsin statutes providing for direct actions against the insurer are limited to negligence claims.

Although the plaintiff disagrees that "the direct action statute may be confined purely to negligence actions," she states that she does assert negligence claims against Saftig. Specifically, the plaintiff asserts intentional or negligent claims against Saftig for "breach of the Fair Credit Reporting

31

Act," "infliction of emotional distress," and "breach of her privacy rights under Wisconsin law." (Pl.'s Resp. 18.)

An intentional or negligent breach of the FCRA is a federal claim, and the plaintiff's assertion of negligent infliction of emotional distress is inappropriately brought at this stage in the litigation. Thus, the plaintiff cannot bring a direct action against Zurich under Wis. Stat. §§ 632.24 and 803.04(2)(a) for these two claims.

However, the plaintiff also asserts a claim for invasion of privacy. Section 995.50(2)(c) of the Wisconsin Statutes provides that a person's right to privacy is violated where "publicity [is] given to a matter concerning the private life of another, of a kind highly offensive to a reasonable person, if the defendant has acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter involved . . . ." The statute explicitly provides for a cause of action for a negligent violation if the defendant was acting "unreasonably." This demonstrates that the plaintiff has alleged a claim for negligence under state law. Thus, Wis. Stat. §§ 632.24 and 803.04(2)(a) apply to the present case and the court will not dismiss Zurich from the action.

### C. Anonymity of the Plaintiff

The court has one final issue to discuss. The plaintiff is currently proceeding with her case under a fictitious name. Anonymous litigation is highly disfavored by the Seventh Circuit. *Doe v. Smith*, 429 F.3d 706, 710 (7th Cir. 2005). Indeed, judicial proceedings are to be conducted in public because the people have a right to know who is using their courts and for what purposes. *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). However, the presumption that the parties' identities are public information and must be disclosed may be rebutted by demonstrating that the harm to the plaintiff of revealing her identity exceeds the likely harm from concealment. *Doe v. City of*

*Chicago*, 360 F.3d 667, 669 (7th Cir. 2004). For example, "[f]ictitious names are allowed when necessary to protect the privacy of children, rape victims, and other particularly vulnerable parties or witnesses." *Blue Cross & Blue Shield of Wis.*, 112 F.3d at 872. However, the court has held that the fact that a case involves a medical issue is an insufficient reason to allow the use of a fictitious name. *Id*.

It is the district court's duty to determine whether exceptional circumstances warrant anonymous litigation. *City of Chicago*, 360 F.3d at 669–70. Thus, the court will require that the plaintiff show cause for continued anonymity in this case. If anonymous litigation is deemed to be inappropriate, the plaintiff will be allowed to dismiss the action in lieu of revealing her name.

## V. CONCLUSION

The court will grant the defendants' motion for summary judgment as it relates to (1) section 995.50(2)(a) of the plaintiff's right to privacy claim; (2) the plaintiff's claim of intentional infliction of emotional distress; (3) the plaintiff's due process and equal protection claims under the Fourteenth Amendment; and (4) the plaintiff's due process and equal protection claims under the Wisconsin Constitution. The court will deny the defendants' motion as it relates to (1) section 995.50(2)(c) of the plaintiff's right to privacy claim; (2) the plaintiff's FCRA claim; and (3) the plaintiff's direct action against Zurich pursuant to Wis. Stat. § 803.04(2)(a).

**NOW THEREFORE IT IS ORDERED** that the plaintiffs' Motion for Summary Judgment be and hereby is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that on or before June 1, 2011, the plaintiff shall show cause for the plaintiff's continuing to seek anonymity in this action;

**IT IS FURTHER ORDERED** that a conference with the parties to discuss the further processing of this case to final resolution and judgment will be conducted on June 6, 2011 at 9:00 a.m., in Courtroom

33

242, United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.

**SO ORDERED** this <u>11th</u> day of May 2011, at Milwaukee, Wisconsin.

**BY THE COURT:**

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge